LIMERICKS, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

G. L. LIMERICK, TRANSFEREE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

B. O. LIMERICK, TRANSFEREE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 7547, 7577, 7578. Promulgated November 12, 1946.

*Howell Ward, Esq.,* and *Fred F. Morgan, C. P. A.,* for the petitioners.

*Allen T. Akin, Esq.,* for the respondent.

OPINION.

HARLAN, *Judge*: The most fundamental consideration in the determination of the nature of the payments made by Limericks, Inc., to G. L. Limerick is the relationship of G. L. Limerick to the corporation, as it is obvious that payments made on contracts negotiated at arm's length may have an entirely different character than payments made between a corporation and its sole stock owner.

In this case G. L. Limerick owned a building and a furniture business located therein in the year 1937. In 1938 the furniture business was acquired by a corporation the stockholders of which consisted of Limerick's wife, daughter, and son-in-law, yet there is no evidence that Limerick himself received any consideration therefor, and he certainly did not receive any stock in the corporation. All that he had after the corporation was formed was the same position as manager which he had held as a matter of course while he was operating the business. When the B & B Furniture Co. then increased its capital stock from 60 shares to 250 shares, Limerick acquired, by a transaction he designates as a "purchase," 190 shares of stock in the enlarged corporation and became president thereof. What consideration, if any, he paid for his 190 shares is not disclosed in the record. Prior to acquiring this stock Limerick says that he entered into an oral contract with the "shareholders" of the B & B Furniture Co. whereby the rent was to be increased from $12,000 a year to $18,000 a year, beginning January 1, 1942. However, Limerick was completely indefinite as to when or where this agreement was consummated with the stockholders and there was no reference to such agreement in the minutes of the stockholders' meeting, nor was there any written memorandum of the lease made. Limerick rented property to the corporation at 425 North Chaparral Street from 1938 until October 1940 for $800 per month and from then to June 1941 at $1,000 a month. This property had a market value of $117,500. He then rented the property at 205 South Chaparral Street, which he had acquired at a cost of $50,698, for $18,000 a year. This agreement was evidenced by a resolution of the directors of the corporation at a regular meeting held in July of 1942 and was made "retroactive" to January 1, 1942.

One might well be dubious of the existence of the alleged oral contract or lease which Limerick says he made in the spring of 1941, but for which there was no corroborative memorandum made at that time and to which no reference was made when the directors passed their resolution in July 1942. Certainly if there had actually been a contract entered into in the spring of 1941, there would be no reason for making the rental agreement "retroactive" in July 1942.

Furthermore, there could be no serious question but that the real estate and the corporate stock owned by Limerick and the corporate

stock owned by Mrs. Limerick were all community property. Limerick testified that the money used to purchase the property at 425 North Chaparral Street, the sale of which supplied the funds to purchase the property at 205 South Chaparral Street, was the joint funds of Mrs. Limerick and himself. "Mrs. Limerick and myself had been in business together in all of our business ventures since we were married * * *. Our business is owned together." There was no testimony introduced into the record overcoming the presumption also that Mrs. Limerick's stock in Limericks, Inc., was also community property. The presumption that such property is community property is well established in the law of Texas.

Therefore, we not only have a corporation leasing property from the owner of 76 per cent of its capital stock, but we also have a situation where a husband and wife own all the stock in the corporation except qualifying shares and not only are the dividends received on the stock equally divided between the two shareholders without regard to the number of shares owned by each, but the profits obtained from the lease are also equally divided between these two stockholders without regard to the number of shares they hold in the corporation.

It is therefore immaterial whether or not there was an oral contract for a lease prior to the time G. L. Limerick became an actual stockholder, as he and his wife, both before and after that event, divided the rental receipts and the dividends between them. It is also immaterial whether the excessive payments made under the guise of rent had any relation to the number of shares of stock held by Limerick, since all the stock, as well as the real estate, was owned as a community interest of Limerick and his wife.

That paragraph of section 23 of the Internal Revenue Code permitting deductions from income of rental payments describes such deductions as follows:

* * * rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity.

The Commissioner has determined that all of the rentals paid in 1942 and 1943, except $500 a month thereof, were in reality dividends paid under the guise of rent and were not payments which the corporation was "required" to pay to procure the occupancy of such building.

The courts have frequently permitted the Commissioner to inquire into and disallow payments which a corporation made in excess of the amount which it should be required to pay for rent, where the individual collecting the rent was the sole or majority stockholder of the corporation. See *LeMoyne* v. *Commissioner*, 47 Fed. (2d) 539;

*Orange & Domestic Laundry Co.*, 6 B. T. A. 646; *McKeever* v. *Eaton*, 6 Fed. Supp. 697.

The case at bar is clearly distinguishable from *Stanley Imerman*, 7 T. C. 1030. In that case the Commissioner had not determined that the excess rent paid constituted disguised dividends and there was no evidence that any portion of the disallowed rent was in reality a gift to the landlord, nor was there any evidence that the deals between the landlord and the tenant were not at arm's length.

In this case the Commissioner contends that, since G. L. Limerick paid but $50,700 for the rented property, a rental payment to him of $500 per month would return 11½ per cent on his investment and be adequate as rent. He contends, furthermore, that this rental property is worth only half as much as it would be if located in the 400 block on Chaparral Street, where petitioner corporation had been occupying rented premises, first for $8,000 and then for $10,000 per year, in a property which had a market value of $117,500. The Commissioner also argues that the property located on South Chaparral Street, which is in a low rent district, could not reasonably rent at 96 cents per square foot when property in the high rent district, used for the same purpose, was renting for 80 cents per square foot.

Petitioners argue that the nature of the rental district is immaterial in this particular case since the store room was ideally adapted to the corporation's business use because of the increased display space, the larger show windows, and the customers' parking lot in the rear. They call attention to the fact that the business did actually increase in the first full year of occupancy and steadily increased thereafter. They argue that a percentage of this increase should be charged to rent. Petitioners also introduced a so-called expert, who testified that no rent is excessive "if it [the rented premises] is suited to the purpose and to the economy of the person renting it."

We do not believe that the testimony in this case wholly justifies the contentions of either the respondent or the petitioners. The rented premises unquestionably had a low market value in a low rent district and prior to the occupancy of petitioner corporation they had been used only for dead storage space. They were adjacent to two spur railway tracks and in a part of town where few pedestrians passed the store and there was very little other business in the neighborhood. Under such circumstances, it impresses us as almost absurd for the petitioners to contend that the payment of $18,000 a year, which would repurchase the entire building every thirty-four months, would be an amount that the corporation would be "required" to pay as rental if it and the landlord were dealing at arm's length. The absurdity is even more apparent when it is noted that during all of the taxable period involved the directors of petitioner corporation had paid out so much for rent that they did not deem it advisable to distribute any of the

retained profits as dividends. The rental drained all of the money available for dividends, and such a rental could not well be "suited to the economy" of the tenant.

After giving consideration to all of the testimony and the evidence in this case, it is our conclusion that all payments in excess of $700 per month made by petitioner corporation to G. L. Limerick, its chief stockholder, under the designation of rent were in truth and in fact distributions of dividends to Limerick and, therefore, are not deductible.

The payment by petitioner corporation of $8,400 per year rental will give at least a color of verity to petitioner's advertisement that it had moved into "a low rent" district. While it is regrettable from the undisputed evidence in this case that petitioner's customers did not "save the difference," the law will permit the Government to "tax the difference."

*Decision will be entered under Rule 50.*